IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| JANETT CURDEDLIA CAMPOS, : | |
| : | |
| Plaintiff, : | Civil No. 18-15905 (RBK) |
| : | |
| v. : | **OPINION** |
| : | |
| COMMISSIONER OF SOCIAL SECURITY, : | |
| : | |
| Defendant. : | |

**KUGLER**, United States District Judge:

This matter comes before the Court upon Plaintiff Janett Campos' appeal (Doc. 1) from the final decision of the Commissioner of Social Security ("the Commissioner") denying Plaintiff's claim for Supplemental Security Income ("SSI") under the Social Security Act. For the reasons expressed herein, this case is REMANDED for further administrative proceedings consistent with this Opinion.

## I. PROCEDURAL BACKGROUND[1]

Plaintiff filed her application for SSI on April 11, 2013, with an alleged disability onset date of November 17, 2011.[2] (R. 143.) Her claim was denied on August 20, 2013, and again on reconsideration on January 20, 2014. (R. 153, 165.) On February 28, 2014, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (R. 181–183.) On April 25, 2016, ALJ

---

[1] Because the record is voluminous, the Court sets forth only those facts necessary for context and relevant to the issues upon appeal. The Court cites to the administrative record as "R." Background facts and medical history are set forth in a separate section below.

[2] Plaintiff later amended her alleged onset date to February 16, 2014. (R. 69.)

1

Nycole Watson presided over a hearing during which Plaintiff and a Vocational Expert ("VE") gave testimony. (R. 60–142.) On February 23, 2017, the ALJ issued an unfavorable decision. (R. 7–21.) Plaintiff requested review of the ALJ's decision, which the Appeals Council denied on September 11, 2018, making the ALJ's determination the final decision of the Commissioner. (R. 1–6.) Plaintiff appeals this decision now.

## II.     LEGAL STANDARD

### A.  Sequential Evaluation Process

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses an established five-step evaluation process to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520.

For the first four steps of the evaluation process, the claimant has the burden of establishing her disability by a preponderance of the evidence. *Zirnsak v. Colvin*, 777 F.3d 607, 611–12 (3d Cir. 2014). First, the claimant must show that she was not engaged in "substantial gainful activity" for the relevant time period.  20 C.F.R. § 404.1572. Second, the claimant must demonstrate that she has a "severe medically determinable physical and mental impairment" that lasted for a continuous period of at least twelve months. 20 C.F.R. § 404.1520(a)(4)(ii); 20 C.F.R. § 404.1509. Third, either the claimant shows that her condition was one of the Commissioner's listed impairments, and is therefore disabled and entitled to benefits, or the analysis proceeds to step four. 20 C.F.R. § 404.1420(a)(4)(iii). Fourth, if the condition is not equivalent to a listed impairment, the ALJ must assess the claimant's residual functional capacity ("RFC"), and the claimant must show that she cannot perform her past work. 20 C.F.R. § 404.1520(a)(4)(iv); 20

C.F.R. § 404. 1520(e). If the claimant meets her burden, the burden shifts to the Commissioner for the last step. *Zirnsak*, 777 F.3d at 612. At the fifth and last step, the Commissioner must establish that other available work exists that the claimant can perform based on her RFC, age, education, and work experience. *Id.*; 20 C.F.R. § 404.1520 (a)(4)(v). If the claimant can make "an adjustment to other work," she is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(v).

### B. Review of the Commissioner's Decision

When reviewing the Commissioner's final decision, this Court is limited to determining whether the decision was supported by substantial evidence, after reviewing the administrative record as a whole. *Zirnsak*, 777 F.3d at 610 (citing 42 U.S.C. § 405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir. 2000). Substantial evidence is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence." *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). Courts may not set aside the Commissioner's decision if it is supported by substantial evidence, even if the court "would have decided the factual inquiry differently." *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001).

When reviewing a matter of this type, the Court must be wary of treating the determination of substantial evidence as a "self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). The Court must set aside the Commissioner's decision if it did not take into account the entire record or failed to resolve an evidentiary conflict. *See Schonewolf v. Callahan*, 927 F. Supp. 277, 284–85 (D.N.J. 1997) (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)). Evidence is not substantial if "it really constitutes not evidence but mere conclusion," or if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing

3

*Kent*, 710 F.2d at 114). A district court's review of a final determination is a "qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham." *Kent*, 710 F.2d at 114.

### III.   FACTUAL BACKGROUND

Plaintiff was born on February 29, 1968, and was 45 years old on her alleged disability onset date of February 16, 2014. (R. 20.) Her education stopped after 7th grade; she never received her GED, and alleges an inability to read. (Pl. Br. at 9.) Plaintiff had her first child at age 16, and presently has eight children from three different fathers, none of whom she currently lives with. (Pl. Br. at 10.) One of her adult daughters assists her with daily activities by bringing her food and helping with laundry. (R. 105-111.) Plaintiff sees her two minor children every other weekend. (R. 111.) Plaintiff does not drive and has never had a driver's license. (Pl. Br. at 10.) She previously worked as a dishwasher, housekeeper, and retail salesperson. (R. 279.)

#### A. Medical History

Plaintiff alleges a history of physical and mental health issues, including: high cholesterol, high blood pressure, migraines, "cardiac issues" including a history of congenital heart disease, emphysema, back and neck pain, enlarged thyroid, psychotic disorder, schizoaffective disorder-bipolar type, anxiety disorder, insomnia, mood disorder, auditory and visual hallucinations, depression, and post-traumatic stress disorder ("PTSD") stemming from childhood sexual abuse. (Pl. Br. at 10.)

Plaintiff began seeking psychiatric help at Atlanticare Behavioral Health Adult Intervention Services ("AIS") in 2014. (R. 551.) At AIS, she regularly saw a psychiatrist, Dr. Ewaen Okeo, and had consistent individual therapy appointments with Cheri Caruso, a licensed social worker. (R. 559.) During her sessions, Plaintiff reported having auditory and visual

hallucinations over the past 20 years. (R. 554.) At times, the voices she heard instructed her to harm others. (R. 554.) She stated that she has been able to ignore the voices for the most part, or at times she cannot, her daughter helps to calm her down. (R. 554.) Throughout the time Plaintiff attended therapy at AIS, the auditory hallucinations occurred intermittently, but were not as troubling when Plaintiff took her prescribed medication and abstained from alcohol. (R. 568–570.)

In July 2015, Plaintiff's symptoms rose sharply in severity, and she reported hearing voices telling her to hurt herself and others. (R. 658.) Her therapist noted that she was noticeably worse and potentially suicidal; Plaintiff was transported via ambulance to the emergency department due to the severity of her symptoms. (R. 658.) Plaintiff was reportedly doing better in the following weeks, though continued to have intermittent auditory hallucinations. (R. 659, 673.)

In February 2016, Plaintiff was arrested for attempting to stab her partner, and was charged with aggravated assault and possession of a weapon for an unlawful purpose. (R. 572, 719.) She reported that the voices told her to "kill," but that she did not have memory of actually attacking her partner. (R. 764–765.) After this incident, AIS referred Plaintiff to an acute partial care program at APC mental health. (R. 780.) Plaintiff was admitted to and began attending the APC program on March 24, 2016. (R. 780.)

Plaintiff presently attends the APC partial hospitalization program Monday through Friday, from 9:00 A.M. to 3:00 P.M., to manage her symptoms. (Pl. Br. at 10.) The program serves food, monitors and administers medications, and provides counseling and group therapy. (*Id*.) Treatment notes in the record from APC are generally positive, noting that, although she has hallucinations, Plaintiff is able to interact with staff and peers well, and is often in a good mood with no suicidal ideation. (R. 789–793.)

### *Dr. Ewaen Okao*

Dr. Okao, whom Plaintiff saw regularly at AIS, completed several reports evaluating Plaintiff's mental health. On July 9, 2014, he completed a Mental Impairment Questionnaire in which he summarized notes from Plaintiff's weekly psychotherapy sessions and bi-weekly medication management and mental status evaluations. (R. 708.) He listed Plaintiff's impairments, including "Psychotic Disorder NOS," PTSD, Deferral, Hypertension, Hyperlidemia, and Uterine Cervix Disease. (R. 708.) He completed a checklist in which he noted Plaintiff's symptoms as including loss of interest in activities, thoughts of suicide, blunt affect, impairment in impulse control, mood disturbance, difficulty thinking or concentrating, hallucinations or delusions, paranoid thinking, perceptual or thinking differences, and emotional withdrawal. (R. 709.) In another checklist, he evaluated Plaintiff's mental abilities and aptitudes needed to do unskilled work; in all areas, Dr. Okao found that Plaintiff was at best seriously limited, and at worst had no useful ability to function. (R. 710.) He explained that Plaintiff suffered from a "severe and persistent mental illness that include[s] daily auditory and visual hallucinations," and stated that her "persistent intermittent [audio and visual hallucination] command type prevent [Plaintiff] from meeting competitive standards or having useful ability to function." (R. 710–711.)

In August 2014, Dr. Okao completed an Examination Report for the New Jersey Division of Family Development. (R. 592.) In this report, Dr. Okao stated that Plaintiff suffered from schizophrenia and "r/o schizoaffective disorder," and noted she could not work because her condition was chronic and required "continual close mental health follow up." (R. 593.) He indicated that Plaintiff's condition would last 12 months or more. (R. 593.)

In September 2015, Dr. Okao completed another Examination Report. (R. 672.) In this report, he again diagnosed Plaintiff with schizoaffective disorder, stated that she needed

psychotherapy weekly or biweekly, and found that she would not be able to work because her condition caused a significant impairment in her impulse control. (R. 672.)

### *Dr. Barbara Kelly*

On May 11, 2016, Dr. Barbara Kelly, a clinical psychologist, evaluated Plaintiff and completed an "Atlantic City Medical Evaluation." (R. 813–815.) She found that Plaintiff presented as agitated, easily provoked, and was paranoid with disorganized speech. (R. 814.) Plaintiff did not know the president's name, could not spell the word "world," and could not do serial sevens. (R. 814.) Dr. Kelly diagnosed Plaintiff with schizoaffective disorder, bipolar type, and found that Plaintiff needs assistance with self-care and "would need complete oversight in management of funds due to cognitive impairment." (R. 814.) She listed Plaintiff's prognosis as "poor."

On June 10, 2016, Dr. Kelly completed a Medical Source Statement. (R. 833–835.) In this statement, she indicated that Plaintiff had marked limitations in her ability to understand, remember, and carry out instructions at work. She wrote, "cognitive impairment is marked and evident across all domains. Memory is impaired, speech disorganized and thought processes derailed by active psychosis." (R. 833.) She indicated that Plaintiff also had marked limitations in her ability to interact appropriately with the public, supervisors, and coworkers, and in her ability to "respond appropriately to usual work situations and to changes in a routine work setting." (R. 834.) She stated that "visual, auditory and tactile hallucinations as well as paranoid delusions are present. [Plaintiff] avoids others due to her fear of harming them in response to command hallucinations." (R. 834.) She added that Plaintiff's "activities of daily living, self-care and socialization are restricted due to active psychosis and cognitive impairment," and noted that Plaintiff "is easily agitated, disoriented and needs assistance with self-care. She is unable to manage funds, do household tasks, or transport herself independently." (R. 834.)

*State Agency Physicians*

Dr. Nancy Simpkins, a state agency physician, reviewed the record and opined on Plaintiff's physical limitations. She noted that Plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently, that she could stand, walk, and/or sit for six out of eight hours, and that she had no limitations in pushing or pulling. (R. 149.) She added that Plaintiff could occasionally climb ramps and stairs, should never climb ladders, ropes, or scaffolds, and could occasionally balance, stoop, kneel, crouch, and crawl. (R. 149.) She stated that Plaintiff had no manipulative, visual, or communicative limitations. (R. 150.) Another state agency physician, Dr. Mohammad Rizwan, agreed with Dr. Simpkins' physical findings upon reconsideration. (R. 164.)

**B. The ALJ's Decision**

On April 25, 2016, Plaintiff and a VE gave testimony at a hearing before the ALJ. (R. 60–142.) At the hearing, Plaintiff testified about her mental limitations, literacy issues, problems interacting with work supervisors, her daily living activities, and family dynamics. (*Id.*) On February 23, 2017, the ALJ issued her decision. (R. 7–26.)

At step one, she found that Plaintiff had not engaged in substantial gainful activity since her amended alleged onset date of February 16, 2014. (R. 12.) At step two, she found that Plaintiff has two severe impairments: schizoaffective disorder and hypertension. (R. 12.) She also noted that Plaintiff's additional medical conditions—including hyperlipidemia, posttraumatic stress disorder, mild obstructive sleep apnea, emphysema, and uterine cervix disease—were not "severe impairments" because they did not "cause more than minimal functional limitations or negatively affect [Plaintiff's] ability to perform the normal demands of work." (R. 14.)

At step three, the ALJ found that Plaintiff's impairments did not meet the severity of any listed impairments. (R. 14.) She assigned the following limitations to Plaintiff: mild limitations in

8

understanding, remembering, or applying information; moderate limitations in concentrating, persisting, or maintaining pace; and mild limitations in adapting or managing oneself. (R. 15.) The ALJ then formulated Plaintiff's RFC, finding that she can:

> Perform a range of light work as defined in 20 CFR 416.967(b). She can occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds. In an eight-hour workday, she could stand and/or walk for a total of about six hours and sit for a total of about six hours. She can push and/or pull as much as she can lift and/or carry. She can occasionally climb ramps and stairs. She must avoid climbing ladders, ropes or scaffolds. She can occasionally stoop, kneel, crouch and crawl. She should perform work that requires no interaction with the public and no more than occasional interaction with coworkers, and that interaction with coworkers should be on a brief, superficial basis. Supervision should be direct and non-confrontational. She is limited to GED reasoning level one jobs, where the complexity of tasks is learned and performed by repetition with few variables, and where little judgment is required.

(R. 16.)

Evaluating the medical evidence in the record, the ALJ stated that she gave some weight to the physical limitations described by Drs. Rizwan and Simpkins. However, she gave the opinions only partial weight overall, as the opinions did not address Plaintiff's mental impairments. (R. 18.) She gave Dr. Okao's opinions little weight, finding that his conclusion—that Plaintiff was disabled and "unable to meet competitive standards in almost every area of mental abilities and aptitudes"—was inconsistent with treatment notes that showed consistent improvement with medication compliance. (R. 18.) The ALJ also gave Dr. Kelly's opinion little weight, finding that it was a "dramatic magnification of [Plaintiff's] symptoms." (R. 19.) The ALJ found that Dr. Kelly's opinion was inconsistent with the overall record, which showed improvement of symptoms. (R. 19.)

The ALJ next determined that, despite Plaintiff's assertion that she was illiterate, Plaintiff's work history was "inconsistent with illiteracy," and that she could speak and write in English. (R. 19–20.) Given the calculated RFC, the ALJ found that Plaintiff could not perform any past relevant

9

work of housekeeper, retail salesperson, dishwasher, or stock checker, and proceeded to step five. (R. 20.) At step five, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff could perform, including lining scrubber, mixer operator, and machine puller. (R. 21.) Accordingly, the ALJ found that Plaintiff was not disabled. (R. 21.)

**IV.    DISCUSSION**

Plaintiff makes an extensive number of arguments on appeal, which can be categorized as follows: (1) whether the ALJ erred in evaluating Plaintiff's literacy; (2) whether the ALJ erred in her treatment of the medical opinion evidence from Dr. Okao and Dr. Kelly; (3) whether the ALJ properly considered all of Plaintiff's impairments in determining her RFC; and (4) whether the ALJ erred in her treatment of the VE's testimony.

**A.    Whether the ALJ erred in assessing Plaintiff's literacy**

Plaintiff alleges that the ALJ wrongfully concluded that Plaintiff had completed a literacy program and learned how to read. (Pl. Br. at 16–17.) Plaintiff asserts that she dropped out of school after seventh grade and has not had any education since; she never obtained her GED, and has not significantly advanced her reading skills. (*Id.*) She states that, while she is attempting to learn how to read, she is still functionally illiterate, which largely restricts the type of work she can do. (*Id.* at 17.) Plaintiff argues that the RFC developed by the ALJ, which limits Plaintiff to "GED reasoning level one jobs," is therefore improper, as the ALJ assumed that she could work in positions requiring literacy. (*Id.* at 17–20.) Plaintiff argues that the ALJ further erred by failing to send her for an IQ test as requested to determine Plaintiff's intellectual capabilities. (*Id.* at 20.) She claims that, if the ALJ had properly found Plaintiff to be illiterate, and had limited her to sedentary work, then she would be found disabled under the Grid Rules. (*Id.*)

10

In response, Defendant argues that any error here was harmless, since the ALJ limited Plaintiff to light, not sedentary, work and thus the grid rules would not result in an automatic finding of disabled. (Def. Br. at 19.) Defendant further argues that, notwithstanding whether any error was harmless, the ALJ's finding of literacy is supported by substantial evidence. (Def. Br. at 19–20.) As support, Defendant points to notes in the record detailing Plaintiff's reading and writing progression, arguing that these notes suggest that Plaintiff was learning to read and write new words from June 2014 to September 2015, even if not in a formal educational setting. (Def. Br. at 20.)

Under the relevant guidelines, illiteracy is defined as "the inability to read or write. We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling." 20 C.F.R. § 416.964(b)(1). Reviewing the record, the Court finds that the ALJ's determination that Plaintiff was not illiterate was not based on substantial evidence.

In her written decision, the ALJ noted that Plaintiff dropped out of school after the seventh grade, at which "time she could not read or spell." (R. 16.) Nonetheless, she found the record to be "inconsistent with illiteracy" because Plaintiff's therapist had helped her with her literacy and because Plaintiff worked as a shoe stocker. (R. 18.) In relying on these two factors to evidence literacy, the ALJ misinterprets treatment notes and ignores conflicting evidence in the record.

The ALJ highlights a treatment note from August 20, 2015, in which Plaintiff's therapist reports that she is "doing ok," and takes this as evidence that Plaintiff is "doing ok" with literacy. (R. 18, 675.) However, the note that Plaintiff is "doing ok" clearly refers to Plaintiff's subjective mood, and not her ability to read. (R. 675.) In July 2014, Plaintiff began discussing her illiteracy

11

with her therapist. (R. 599.) After that date, her therapist does note instances where she assists Plaintiff in learning to read and write, but never indicates that Plaintiff has achieved literacy. (*See, e.g.,* R. 599, 646, 675.) In her testimony before the ALJ, Plaintiff explained that her therapist's assistance typically involved showing her flashcards with pictures of animals on it, and then Plaintiff would practice copying down the name of the animal shown on the flashcard. (R. 117–118.) In September 2015, Plaintiff had just begun attempting to write a sentence. (R. 679.) Thus, while Plaintiff's literacy abilities may have improved somewhat with assistance from her therapist, the record does not show that Plaintiff successfully learned how to read and write even basic information.

Further, the ALJ failed to address conflicting evidence when she stated that Plaintiff's work as a shoe stocker was semi-skilled, and thus inconsistent with illiteracy. Plaintiff had testified before the ALJ that her children filled out the job application for this position for her because she could not read or write. (R. 116–117.) She also testified that she was terminated from her job stocking shoes in part because she could not read labels to determine where shoeboxes should go, and she was too embarrassed to seek help. (R. 84–86.) Thus, the mere fact that Plaintiff held this job is not, by itself, substantial evidence in support of literacy; the ALJ must also address the conflicting evidence in the record. *See Brawley v. Colvin*, Civ. No. 13-153, 2014 WL 2050190, at *3 (W.D. Pa. May 19, 2014) (remanding where the ALJ failed to address conflicting evidence when determining the plaintiff's literacy and education level).

Accordingly, the Court finds that the ALJ's determination of Plaintiff's literacy was not supported by substantial evidence, as there is no indication in the record that Plaintiff can "read or write a simple message such as instructions," and there is in fact evidence to the contrary. 20 C.F.R. § 416.964(b)(1). Defendant argues that, even if the ALJ's literacy finding was in error, remand is

unwarranted because the ALJ acknowledged that Plaintiff did not complete middle school. (Def. Br. at 20.) The Court disagrees, as Plaintiff's literacy—or lack thereof—influences the occupations she could realistically obtain. *Harris v. Astrue*, Civ. No. 11-00556, 2012 WL 1902596, at *9 (M.D. Pa. May 25, 2012) (noting that, if an ALJ "poses a hypothetical question to a vocational expert that fails to reflect all of the applicant's impairments that are supported by the record, the vocational expert's opinion cannot be considered substantial evidence") (citing *Ramirez v. Barnhart*, 373 F.3d 546, 552–553 (3d Cir. 2004)).

The ALJ's current decision fails to address conflicting evidence regarding Plaintiff's illiteracy and lacks discussion of whether Plaintiff would be able to perform the jobs suggested by the VE given her level of literacy. Remand is thus warranted. *See, e.g., Woods v. Berryhill*, Civ. No. 16-1561, 2018 WL 783680, at *3 (W.D. Pa. Feb. 8, 2018) (remanding where the ALJ found the plaintiff illiterate without addressing conflicting evidence, noting that "the Commissioner is required to support a finding of literacy by reference to the evidentiary record where, as here, the claimant has presented evidence of functional illiteracy") (internal citation omitted); *Haynes v. Colvin*, Civ. No. 14-1878, 2016 WL 5661555, at *9 (E.D. Pa. June 16, 2016), *report and recommendation adopted*, 2016 WL 5661934 (E.D. Pa. Sept. 29, 2016) (remanding where the ALJ failed to consider conflicting evidence before finding that the plaintiff was not illiterate, and instructing the ALJ upon remand "to determine whether and to what extent limitations in this regard impact Plaintiff's RFC").

**B.     Whether the ALJ erred in assessing medical opinion evidence**

Plaintiff next argues that the ALJ improperly rejected the opinions of Dr. Ewaen Okao and Dr. Barbara Kelly in formulating her RFC.

    **i.     Dr. Okao**

Plaintiff argues that the ALJ erred by failing to properly consider Dr. Okao's medical opinion statements from July 2014, August 2014, and September 2015, and also failed to consider that Dr. Okao's opinion was entitled to greater weight as a treating source. (Pl. Br. at 32–38.)

The Third Circuit instructs that, "[w]here a treating source's opinion on the nature and severity of a claimant's impairment is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record,' it will be given 'controlling weight.'" *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001) (quoting 20 C.F.R. § 404.1527(d)(2)). Defendant does not appear to dispute that Dr. Okao is a treating source, but instead argues that the ALJ properly gave little weight to Dr. Okao's opinion statements because they were inconsistent with his regular treatment notes, which showed Plaintiff's symptoms improving with treatment and better sleep. (Def. Br. at 25–26.)

In her written decision, the ALJ devoted two short paragraphs to Dr. Okao's medical opinions. (R. 18.) She noted that Dr. Okao's July 2014 impairment questionnaire found Plaintiff "unable to meet competitive standards in almost every area of mental abilities and aptitudes," and found that this was inconsistent with his treatment notes that "demonstrate consistent improvement and a significant reduction in hallucinations once her sleep improved and she learned how to improve her coping skills." (R. 18.) She also noted that Plaintiff's "great strides in reading and spelling" were inconsistent with Dr. Okao's opinion. (R. 18.) Because of these alleged inconsistencies, the ALJ gave "little weight" to all of Dr. Okao's opinion statements. (R. 18.)

The Court finds that the ALJ's decision to afford little weight to Dr. Okao's opinion statements is not supported by substantial evidence, as it fails to address conflicting evidence in the record. As discussed above, the ALJ erred in her assessment of Plaintiff's literacy. Thus, the

14

ALJ's finding that Dr. Okao's opinion statements are inconsistent with Plaintiff's level of literacy is not proper grounds for rejecting Dr. Okao's opinions. Further, contrary to the ALJ's findings, the opinion statements are not inconsistent with treatment notes throughout the record.

While the ALJ is correct that there are notations throughout the record showing that Plaintiff's symptoms improved with medication, the record is clear that, even with improvement, Plaintiff still suffered from severe auditory and visual hallucinations and had suicidal and homicidal episodes. The record reads closer to a pattern of highs and lows, rather than the steady improvement asserted by the ALJ. For example, Dr. Okao's treatment notes from several visits state that Plaintiff had good judgment and impulse control. (R. 563, 564, 578, 585.) However, on several other occasions—both before and after the positive notes—Dr. Okao noted that Plaintiff's judgment and impulse control were "fair," that she was suffering from auditory hallucinations, that she was having trouble controlling her anger issues, and that she was experiencing mood and psychotic symptoms. (R. 600, 603, 611, 618, 624, 636.) The record shows that Plaintiff's symptoms often changed erratically and unpredictably. For example, on July 23, 2015, Plaintiff told Dr. Okao that she was doing well (R. 655), but approximately one week later, Plaintiff had to be transported to the emergency department via ambulance because she was suicidal and hearing voices telling her to hurt herself and others. (R. 658.) Plaintiff appeared to temporarily improve after this event, but then again deteriorated to the point that, in February 2016, she was arrested for stabbing her partner after hearing voices instructing her to do so. (R. 719, 764.) After Plaintiff's arrest, she was referred to a partial hospitalization program due to the severity of her symptoms. (R. 780.)

In finding that the record contradicted Dr. Okao's opinion statements, the ALJ failed to mention contradictory evidence, such as the above worsening symptoms in July 2015 and February

15

2016. The ALJ also ignored a great deal of contradictory evidence in finding that Dr. Okao's opinions were inconsistent with the notes from Plaintiff's therapist, Cheri Caruso. The therapist's notes indicate that, while Plaintiff did have several good days (R. 643, 646, 675, 688), these visits were often followed by bad days (R. 635, 650). The notes mention that, even during periods of improvement, Plaintiff still had auditory hallucinations that caused trouble with sleeping and with daily living. (R. 650.) On a number of occasions, Plaintiff was disoriented to time and missed her therapy appointments. (R. 608, 609, 612, 622, 627.)

An ALJ "may weigh the credibility of the evidence," however, if there is conflicting evidence in the record, she must address it. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000) (finding remand appropriate where the ALJ "failed to mention or refute some of the contradictory medical evidence before him"); *see also Smith*, 2018 WL 1442881 at *10 (remanding after finding that "some further explanation is needed here to reconcile the rejection of these treating source opinions with the underlying medical records which seem to fully support those opinions"). Accordingly, because the ALJ failed to address conflicting evidence when finding that the record was "inconsistent" with Dr. Okao's opinions, her decision to assign little weight to these opinions was not supported by substantial evidence.

        ii.    **Dr. Kelly**

Plaintiff also argues that the ALJ failed to give proper weight to Dr. Kelly's opinions, including a June 2016 medical source statement and a May 2016 mental status examination. She claims that the ALJ selectively pulled certain positive treatment notes from the record and contrasted those with Dr. Kelly's opinion, rather than examining the record as a whole. (Pl. Br. at 44–45.)

16

Again here, the Court finds that the ALJ failed to reconcile conflicting evidence in the record when rejecting Dr. Kelly's opinion. As with Dr. Okao, the ALJ rejected Dr. Kelly's opinion in part because Dr. Kelly found Plaintiff to be illiterate; however, as noted above, the ALJ's finding as to Plaintiff's literacy is not supported by the record. The ALJ also rejected Dr. Kelly's opinion because she found it to represent "a dramatic magnification of the claimant's symptoms as compared with the treatment notes from the partial hospitalization program just one week prior thereto." (R. 19.) The ALJ found that Plaintiff's "treatment records actually note that her symptoms improved from March 25, 2015 through May 2016," despite the "temporary exacerbation" in February 2016, when Plaintiff stabbed her boyfriend. (R. 19.) Given these findings, the ALJ stated that she gave "Dr. Kelly's opinion little weight as I find it inconsistent with the overall weight of the evidence of record." (R. 19.)

In rejecting Dr. Kelly's opinion, the ALJ ignored the years of treatment notes in the record in favor of approximately two months of positive treatment notes from Plaintiff's partial hospitalization program. (R. 19.) While she does at least mention Plaintiff's worsening symptoms in February 2016, she refers to it only as a one-time, "temporary exacerbation." (R. 19.) In doing so, she ignores that the record contains numerous such episodes where Plaintiff's symptoms appear to improve and then suddenly and dramatically worsen. (R. 623, 652, 658, 692, 719.) Thus, for the same reasons as with Dr. Okao, the Court finds that remand is required so that the ALJ may address the conflicting evidence in the record. *Smith*, 2018 WL 1442881 at *10.

Finally, the Court notes that the ALJ's decision is troubling "because in light of the ALJ rejecting the opinions of all treating mental healthcare professional opinions, the ALJ fails to state which opinions or findings the ALJ relied upon in [her] assessment of [Plaintiff's] mental health." *Smith*, 2018 WL 1442881, at *10 (citing *Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F.3d 429,

433 (3d Cir. 1999)). The ALJ is required to do more than state simply that the record supports the decision; rather, an ALJ must "indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." *Smith*, 2018 WL 1442881, at *10 (holding that "the failure to explain any basis upon which the ALJ drew conclusions about [the plaintiff's] mental health, beyond the categorical rejection of all treating source opinions, warrants remand so that the Court can better understand how the ALJ decided that [the plaintiff] is not disabled"); *see also McGuire v. Berryhill*, Civ. No. 18-00367, 2019 WL 2502571, at *11 (M.D. Pa. Apr. 11, 2019), *report and recommendation adopted*, 2019 WL 1923365 (M.D. Pa. Apr. 30, 2019) (remanding after finding that, "by rejecting in whole or in part every medical opinion rendered in this case, the ALJ ran afoul of the rule that in fashioning a residual functional capacity assessment for a claimant an ALJ may not unilaterally reject all medical opinions in favor of the ALJ's own subjective impressions").

Based on the foregoing issues, the Court finds the ALJ's determination that Plaintiff is not disabled is not supported by substantial evidence. *See Smith v Berryhill*, 2018 WL 1442881 at *12 (M.D. Pa. Feb. 16, 2018) (remanding where the ALJ's written decision contained "insufficient explanation of his reasoning in rejecting treating mental healthcare provider opinions"). Because the ALJ may potentially construct a different RFC when assessing Plaintiff's literacy and the medical opinion evidence upon remand, the Court declines to address Plaintiff's remaining arguments.

## V.     CONCLUSION

For the foregoing reasons, this case is **REMANDED** for further administrative proceedings consistent with this Opinion. An accompanying Order shall issue.

Dated: 8/4/2020 /s Robert B. Kugler
ROBERT B. KUGLER
United States District Judge